Filed 5/24/22  P. v. Vines CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ROOSEVELT VINES, JR.,<br><br>      Defendant and Appellant. | A160961<br><br>(Alameda County<br>Super. Ct. No.<br>19CR009370) |

Defendant Roosevelt Vines Jr. shot and killed Mario Thomas at the site of a "memorial" to one of defendant's friends who had been shot the preceding day.  Defendant was convicted of first degree murder, being a felon in possession of a firearm, and attempting to dissuade a witness.

Defendant maintains the prosecutor committed misconduct during cross-examination and closing argument, and that his own counsel was ineffective in failing to object.  He also claims no substantial evidence supports the jury's finding that the murder was premeditated and deliberate.  Lastly, he asserts the court erred in imposing fines without determining his ability to pay.  We affirm.

# BACKGROUND[1]

In August 2018, defendant's friend, Esau Davis, was killed in the 7100 block of International Boulevard in Oakland. Defendant learned about the death the following day, and then went to a memorial spot near where Davis had been killed to try to find out what happened. He carried a gun "on the side of [his] pants."

Defendant testified he encountered Thomas, also a friend, at the memorial spot. Defendant asked Thomas " 'what happened yesterday with Esau.' " Thomas responded he did not know, but " 'word was Esau told on someone and that's what happened.' " Thomas told defendant to " 'be safe,' " and defendant responded he was " 'strapped.' " Thomas asked to see the gun. Defendant had felony convictions and did not want to be seen with a gun. He knew there were surveillance cameras at that location, so he turned away from the cameras before he "pulled [the gun] out to show him." According to defendant, he "pulled [the gun] out and the motherfucker just said pow. And then when it went off, I looked and I seen him drop. . . . [T]hat's when the panic and shit started happening, and I left." He testified he did not intend for the gun to go off.

Defendant drove to his sister's house, changed his clothes, and disposed of his old clothing and the gun in three separate garbage bags. He then drove to the home of his girlfriend, J.W. He testified he was "hysterical," and told her he " 'accidentally shot my partna, [Thomas].' " J.W. told defendant to calm down and take a shower and brought him bleach to get rid of the gunshot residue. According to defendant, the idea of using bleach to

---

[1] We set forth the facts only to the extent necessary to address the issues raised on appeal.

eliminate the gunshot residue was J.W.'s. He "wasn't even thinking about nothing like that really because [he] wasn't trying to hide or cover up."

Oakland police responded to the scene of the shooting after the "Shotspotter," which has microphone sensors that detect shots and calculates their geographic location, indicated a sound consistent with a single gunshot at about 3:43 p.m. near the 7100 block of International Boulevard in Oakland. When police arrived, they found a man, later identified as Thomas, next to a motorized wheelchair with a single gunshot wound to his head. He was pronounced dead at the scene.

Police obtained footage from multiple surveillance cameras near the time and place of the crime. The footage showed a man, later identified as defendant, driving toward the crime scene in a Buick. Defendant parked the car, got out and headed towards Thomas who was sitting in a wheelchair on the other side of a fence. He stood next to Thomas for 90 to 100 seconds, then turned away from the main surveillance camera. The footage showed defendant quickly walking away before Thomas fell face forward to the ground. Defendant then jogged back to the Buick and drove away.

Police began conducting surveillance on the Buick. After obtaining a warrant, police placed tracker devices on the Buick at traffic stops on September 5th and October 2nd. On October 6th, police stopped the Buick for a traffic violation and arrested defendant, the driver, on an out-of-county arrest warrant.

Oakland Police conducted a videotaped interview of defendant almost two weeks later. Defendant initially denied knowing anything about Thomas's shooting, denied knowing where he was killed, and denied talking to Thomas. After police showed him the surveillance video footage of the

3

Buick at the scene, defendant admitted he was in the area and that Thomas and the wheelchair were there.

Defendant told the police he had heard that someone tried to rob Davis and that Thomas might have witnessed Davis's murder. Defendant admitted driving the Buick to the spot where Davis was murdered to figure out what happened to him. He never told the police he accidentally shot Thomas.

Police executed a search warrant at a home in Oakland where defendant stayed with his girlfriend, J.W. Her grandmother and a man named Jackie W. also lived there. Jackie W. told police J.W. told him defendant had " 'shot at somebody.' "

Police found indicia of ownership belonging to defendant in one bedroom, as well as nine-millimeter and .38-millimeter special ammunition, a box of .22 caliber ammunition and a .22 caliber firearm, and shotgun and rifle ammunition.

In May 2019, J.W. called police and said defendant shot Thomas. She left a voicemail for Sergeant Vass of the Oakland Police Department saying "this is pertaining to . . . Roosevelt Vines . . . Uh, he did it. . . . August 27, it was a Monday. Early day. 2018. I might have a bullet. . . . [B]ut his sister did something with the gun."

Sergeant Vass returned her call and told J.W. he would keep her name private. J.W. told Vass defendant came home on the day of the murder and changed his clothes. Defendant told her he had gone to the area of Davis's murder in the Buick and spoke with a man who might have information about it. The man was "disrespectful," so defendant shot him once in the head with a nine-millimeter gun. After the shooting, he went to his sister's house and threw away his clothes and the gun. J.W. helped defendant

4

shower and sprayed him with bleach to eliminate the gunshot residue. J.W. gave Sergeant Vass a bullet.

In October 2019, J.W. learned that defendant knew what she had told police. She called the prosecutor and identified herself as a witness. She said she had heard defendant knew she "snitched on him," "which shouldn't have never happened because [she] wanted to be anonymous." She indicated she now felt her "life [was] in danger."

J.W. testified under a grant of immunity and as a hostile witness. Although she acknowledged earlier telling the police her life was in danger, at trial she testified, "I wasn't afraid. There's nothing to be afraid about." She also testified she "fabricated a story" when she talked to Sergeant Vass because she wanted to get defendant in trouble. She was angry at him because he told her he wanted to move out of state with another woman and take the child he shared with J.W. Defendant similarly testified that J.W. lied to the police about the shooting because she was angry with him because he cheated on her and was planning to take their baby and go to Las Vegas.

Defendant and J.W. visited while he was in jail and talked by phone. Not all their conversations were recorded because they whispered or, on one occasion, defendant motioned to J.W. to put down the hand set which recorded jail conversations. During their conversations, defendant told J.W., " 'I'm not going to slaughter your name.' " He testified that meant "she did whatever she tried to do; like she tried to throw me under the bus. I would never do that to her. . . . It's not worth it."

Defendant explained the "code" in Oakland is "You snitch, you'll get killed or something." He told J.W. to admit she had lied about the case to police, and to speak with his defense attorney's investigator, which she ultimately did. Defendant testified he "told her to . . . tell the truth, so she

5

can tell what I really told her. Don't go and tell the police one thing and then turn around and just leave it like that."

The jury found defendant guilty of first degree murder (Pen. Code, §187),[2] unlawful possession of a firearm (§ 29800, subd. (a)(1)), and dissuading a witness (§ 136.1, subd. (a)(1)), and found true the enhancing allegation under section 12022.3, subdivision (d). The court sentenced him to 50 years to life, plus 3 years, 8 months, in state prison,

## DISCUSSION

### *Prosecutorial Misconduct*

Defendant maintains the prosecutor committed numerous acts of misconduct, both during cross-examination and closing argument.

" ' "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' [Citations.] ' "Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." ' [Citations.] 'When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' [Citations.] Prosecutorial misconduct can result in reversal under state law if there was a 'reasonable likelihood of a more favorable verdict in the absence of the challenged conduct' and under federal law if the misconduct was not 'harmless beyond a reasonable doubt.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 333–334.)

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

6

*Forfeiture*

" ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard impropriety." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 426.) "Where the defendant does not contemporaneously object to alleged misconduct, we generally decline to review the claim on appeal unless a timely admonition could not have cured the harm." (*People v. Rivera, supra*, 7 Cal.5th at p. 334.)

Defendant concedes his counsel did not object to "each instance" of the claimed misconduct but maintains his failure to do so should be excused because any objection would have been futile. He asserts the "prosecutor's conduct was pervasive and continual . . . [and she] was not deterred from committing misconduct when the trial court sustained defense counsel's objections," relying on *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.

In *Hill*, defense counsel "was subjected to a constant barrage of [the prosecutor's] unethical conduct, including misstating the evidence, sarcastic and critical comments demeaning defense counsel, and propounding outright falsehoods. With a few exceptions, all [the prosecutor's] misconduct occurred in front of the jury. Her continual misconduct, coupled with the trial court's failure to rein in her excesses, created a trial atmosphere so poisonous that [defense counsel] was thrust upon the horns of a dilemma. On the one hand, he could continually object to [the prosecutor's] misconduct and risk repeatedly provoking the trial court's wrath, which took the form of comments before the jury suggesting [defense counsel] was an obstructionist,

7

delaying the trial with 'meritless' objections. These comments from the bench ran an obvious risk of prejudicing the jury towards his client. On the other hand, [defense counsel] could decline to object, thereby forcing defendant to suffer the prejudice caused by [the prosecutor's] constant misconduct." (*Hill*, *supra*, 17 Cal.4th at p. 821.) Under those "unusual circumstances," the court concluded defense counsel was excused from the legal obligation to continually object. (*Ibid*.)

Here, in contrast, while defense counsel objected to certain of the prosecutor's questions, he did not do so on the basis of prosecutorial misconduct. Moreover, as defendant concedes, many of those objections were sustained by the trial court. Accordingly, defendant cannot show that objections on the basis of prosecutorial misconduct would have been futile, and has therefore forfeited such claims.

### *Claimed Misconduct During Cross-Examination*

Even had defendant not forfeited his claims of prosecutorial misconduct, they fail on the merits.

Defendant first asserts the prosecutor committed misconduct by "asking argumentative and objectionable questions" during cross-examination of defendant. He identifies the questions: " 'You've been to prison?' "[3] and " 'You don't want to go to prison now, right?' " as misconduct. The trial court sustained defense counsel's relevance objection to the first question but overruled the argumentative objection to the second.

Defendant also claims the following question, to which the court sustained a relevance and argumentative objection, was misconduct: "It

_____

[3] The prosecutor asked this question after defendant testified he "like[d] selling weed," and had five felony convictions for it in Alameda County.

8

sticks out in your mind that Esau Davis gets murdered and then you kill one of your friends the very next day, that sticks out in your mind, right?" After the prosecutor asked the court on which ground the objection had been sustained and stated "May I ask a question or is it irrelevant?" the court spoke to her outside the jury's presence. The court indicated she should "work with me" and "accept" the court's rulings, stating "I don't want to devolve any more than what it has already." The prosecutor then asked, without objection, "It stuck out in your mind these events of Esau getting killed and you killing Mario the very next day, right? [¶] . . . [¶] And that stuck out in your mind because it's unusual?" Defendant claims these questions amounted to misconduct because the prosecutor asked them knowing they were improper and the testimony would be inadmissible.

However, simply asking a question to which an objection is sustained, and following up with questions to which no objections are made, is not misconduct. (See *People v. Lund* (2021) 64 Cal.App.5th 1119, 1145 ["[Defendant] cites cases holding that a prosecutor may commit misconduct by intentionally seeking to admit inadmissible evidence. [Citations.] But those cases involved situations in which prosecutors tried to introduce evidence that was inadmissible in its entirety, particularly when the trial court had already so ruled."].)

Defendant also identifies the following questions concerning defendant's testimony that after shooting Thomas, he left the scene, disposed of his clothes and the gun, lied to police and his friends, and conceded that while in jail, he attempted to communicate with J.W. and his sister in ways to avoid using the jail phones. The prosecutor asked, "Would you agree with me that all of this taken together appears to be the desperate acts of a guilty man?" After an argumentative objection was sustained, she asked "Would

9

you agree that all of that appears desperate?"  The court again sustained an argumentative objection.

The fact that the court sustained objections to these two questions does not mean asking them rose to the level of misconduct.  As explained in *People v. Armstrong* (2019) 6 Cal.5th 735, "[e]ffective and legitimate cross-examination may involve assertive and even harsh questioning.  It is permissible to accuse a witness of being untruthful." (*Id*. at p. 796.)  The defendant in *Armstrong* took issue with the cross-examination, "which he characterize[d] as hostile, repetitive, and argumentative, with frequent accusations of lying.  Even accepting this characterization at face value, it supplies no basis for a claim of misconduct.  This was the cross-examination of the defendant in a capital murder case. . . .  [Defendant] identifies no line of questioning, and the transcript reveals none, that crossed over any boundaries of fair play or that would have led the jury to decide this case on anything other than the facts and the law." (*Ibid*.)

Defendant next claims the prosecutor interjected inappropriate comments throughout his testimony.  Specifically, he maintains her comment of "sure," made after two of his responses, was misconduct.  Defense counsel objected both times, and the court admonished the prosecutor "[P]lease ask the questions.  No comments."

Relying on *People v. Bonilla* (2007) 41 Cal.4th 313, defendant asserts the prosecutor was "prohibited from making comments which 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' "  In *Bonilla*, the prosecutor "referred to the terms of [the] star witness's . . . plea agreement, an agreement that required [him] to testify truthfully," which the defendant maintained constituted impermissible vouching. (*Id*. at p. 334.)

10

The court rejected that claim, noting a prosecutor is "not preclude[d from] all comment regarding a witness's credibility. ' " '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Id*. at pp. 336–337.) The prosecutor's two comments of "sure" could not reasonably have been understood by jurors to permit them to avoid independently assessing defendant's credibility.

Defendant also maintains the prosecutor committed misconduct by asking him "to comment on the testimony of other witnesses." He objects to the following questions about the testimony of J.W: "Q: Would you agree that it appeared like she wasn't telling the whole truth? A: She wasn't telling the truth, no. Q: And would you agree with me it was obvious she wasn't telling the truth? A: I don't know what was going on with her. Like I said, you want me to say thing or do things that y'all already know. Like I don't know. Q: Would you agree with me that it was obvious that she wasn't telling the truth?" At this point, the trial court sustained defense counsel's asked and answered objection. The prosecutor again asked "As you sit there now, do you believe it was obvious she wasn't telling the truth?" The court sustained defense counsel's argumentative and asked and answered objections.

Defendant now claims "[a]sking a defendant whether another witness was lying may constitute misconduct," relying on *People v. Zambrano* (2004) 124 Cal.App.4th 228. *Zambrano*, however, concluded "we disagree that it is always misconduct for a prosecutor to ask 'were they lying' questions. Although the questions generally elicit inadmissible and irrelevant lay opinion testimony [citation] they may be allowable in limited circumstances." (*Id*. at p. 242, italics omitted.) "For example, the questions may be

11

appropriate when necessary to clarify a particular line of testimony. [Citations.]  Even if a 'were they lying' question calls for an inadmissible opinion on another person's veracity, asking one or two such questions, if necessary to clarify a witness's testimony, may not be a 'reprehensible method' of persuading the jury."  (*Ibid*.)

Defendant asserts there "was no evidentiary purpose in asking [him] about [J.W.'s] testimony."  To the contrary, defendant had already testified that J.W. was lying before the prosecutor asked the challenged questions.  He testified J.W. lied about his sister "busting up a gun and throwing it in a lake" because J.W. disliked his sister.  Indeed, J.W. had changed her story over time, and defendant had been charged with dissuading her as a witness. Under these circumstances, the prosecutor's questions in this regard did not constitute misconduct.

### Claimed Misconduct During Closing Argument

Again, assuming defendant preserved his misconduct claims, the prosecutor did not commit misconduct during closing argument and even if any misconduct occurred, it was harmless.

Defendant first asserts the prosecutor misstated the law as to accidental shooting, dissuading a witness, and implied malice.

As to the accident defense, defendant asserts the following italicized statements by the prosecutor were a misstatement of the law:  "Accident. Here we have heard multiple defenses as to what the defendant wants us to believe.  We have heard those multiple defenses, and in the end he has landed on 'accident.'  The legal excuse for accident is defendant was doing a lawful act in a lawful way.  *That doesn't apply here.  By his own admission, he was doing an unlawful act just carrying the gun with him.  He was doing an unlawful act in just possessing the gun at home before he left that day.*

12

*He's doing an unlawful act if he just had ammunition in his pocket. So that doesn't apply.*"

Although defendant asserts the prosecutor's statement that "possessing a firearm made [defendant's] act unlawful, and negated the defense of accident" was legally incorrect, he cites no authority in support of that claim. In any case, even assuming the prosecutor's statements were inaccurate, defendant has not demonstrated prejudice. The court properly instructed the jury on the defense of accident[4] and instructed the jury to follow the court's instructions, not the argument of counsel. Furthermore, there was substantial evidence that defendant's conduct at the time of, and after, the shooting was inconsistent with an accidental shooting. The video showed him, immediately after the gun shot and before Thomas even hit the ground, jogging from the scene. He then disposed of his clothes and the gun, washed himself with bleach, and later lied to police about being at the scene at all.

Defendant next claims the prosecutor misstated the law on the intimidation of a witness. He asserts the following was a false statement of the law: "The defendant expressing hope that she not get served with a subpoena is discouraging her from coming to court." However, defendant has lifted this comment out of context. During rebuttal, the prosecutor explained the law of dissuading a witness, stating: "The jury instruction reads that attempting to discourage someone from coming to court and giving testimony is enough. The defendant at least in jail call number 80 at least discouraged her from coming. It didn't have to work. He didn't have to threaten her. He didn't have to hurt her. It actually doesn't matter if she was so upset with

---

[4] The jury was instructed an accident excusing a homicide is defined as: "1. The defendant was doing a lawful act in a lawful way. 2. The defendant was acting with usual and ordinary caution; and 3. The defendant was acting without any unlawful intent."

13

the government for arresting her that that's why she chose not to testify, not for that instruction. All that matters is that he attempted to just discourage her. That's enough. [¶] So why is he going so hard to deny he tried to discourage her when it's black and white? It's easy to see. . . . Because consciousness of guilt. . . . [¶] . . . [I]f she had the evidence that exonerated him, if she knew that it was an accident, why would he be keeping her out of court? Because it wasn't an accident, because it was a cold-blooded murder, and now he's caught red-handed. That's why he wants to keep her out of court. [¶] The defendant expressing hope that she not get served with a subpoena is discouraging her from coming to court." In context, the prosecutor's statement was legally accurate, and in conformance with the instruction given on intimidation of a witness. The prosecutor fully explained during her opening argument the elements of witness intimidation and noted the evidence supporting it. She noted "Element one: Defendant maliciously tried to prevent or discourage [J.W.] from attending or giving testimony and intended to do so. Element two: [J.W.] was a witness. [¶] And element three: Defendant knew he was trying to prevent or discourage [J.W.] from attending or giving testimony and intended to do so." The prosecutor then stated defendant "literally admitted all three of those elements. Yes, when I told her to get out of the Bay Area, yes, I was trying to make sure you didn't find her. Yes, I was trying to make sure she didn't get served. Yes, I didn't want her to get on the stand and testify." The prosecutor's statement in the rebuttal portion of closing argument was not, in the context of the entire closing, an assertion that defendant could be convicted of witness intimidation based solely on his statement that he hoped J.W. would not be served with a subpoena.

14

As to involuntary manslaughter and implied malice, defendant maintains the prosecutor "confused the jury into believing that the prosecution did not need to prove that [defendant] acted with an intent to kill."[5] He identifies the following statements made regarding the jury instructions on the prosecution's burden: "But it doesn't say I have a burden of proving that [the killing] was not invol[untary manslaughter]. I have a burden of proving that it was not excused. But we looked at the accident instruction. His own attorney concedes that this is not an excused homicide. So that burden has been met. But involuntary manslaughter and murder are mutually exclusive terms.[6] That means they cannot both be true. Because the defendant acted with malice either because he had intent to kill, or because he acted with conscious disregard."

Defendant has not identified any portion of the prosecutor's statements that misstated the law. She correctly stated the prosecution had the burden of proving beyond a reasonable doubt every element of murder and had the burden of proving the killing was not excused. She reiterated the prosecution has the burden to prove malice by either intent to kill, or acting with conscious disregard of human life. And she correctly observed that nothing in the involuntary manslaughter instruction indicated the prosecution had the burden to prove the killing was not involuntary manslaughter.[7]

---

[5] In another part of his opening brief, defendant concedes the "manner of the killing itself did show an intent to kill." (Italics omitted.)

[6] "Involuntary manslaughter is 'the unlawful killing of a human being without malice aforethought and without an intent to kill.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 884.)

[7] Indeed, as the prosecutor explained, by meeting the burden of proving the elements of murder, the prosecution necessarily "disproved" involuntary manslaughter.

15

Nor has defendant identified any aspect of the prosecutor's statements that was confusing or suggested the "prosecution did not need to prove that [defendant] acted with an intent to kill." On the contrary, the prosecutor's statements mirrored the jury instructions. The jury was instructed the prosecution had the burden to prove, beyond a reasonable doubt, all the elements of murder. The instruction specified, "The People have the burden of proving . . . that the killing was first degree murder rather than a lesser crime." "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter."

Defendant claims the prosecutor misstated the law on implied malice when she stated: "And whether or not you all agree that that's enough to say he premeditated and deliberated his murder is a separate issue. But he did intentional actions in conscious disregard for human life. If he points a loaded gun at a human being, that is implied malice murder even if it just went off without him touching the trigger. If he's just doing gun play where he's trying to scare someone or mess with someone, or he thinks it's funny and pretending to shoot somebody and he doesn't even pull the trigger, that is implied malice murder because he's doing intentional actions with conscious disregard to the consequences to human life." Defense counsel's objection was overruled, the court stating, "as I said before, if it conflicts with my instructions, you're the judge of the facts and you must accept the law I have [given]. If you feel it conflicts with my instructions, you're to disregard it."

The prosecutor continued, "I submit to you that the defendant had a conscious disregard for human life, not just indifference. This is conscious disregard. Being that close to another human being with a loaded gun is

16

conscious disregard.  When you point it at him that's enough, whether or not you touched the trigger, but we know he did. [¶]  The defense says that the defendant need only intentionally pull the trigger.  That's not the law.  The act doesn't have to be pulling the trigger.  The act can be pointing it at somebody."  This time the court sustained defense counsel's objection that this misstated the law.

The prosecutor continued, "Pointing a loaded gun at another human being when you know it's loaded and you know the safety is not on is conscious disregard for human life.  That act, even if someone else pulls the trigger, is enough for murder."  Defense counsel again objected, and the court stated: "That's an interpretation.  I'll let you decide that.  Follow the instructions.  You can listen to the arguments, but follow the instructions."

Defendant now claims the "prosecutor misstated the law by stating that . . . simply . . . showing that [defendant] was playing with the gun or was aiming the gun, even if [defendant] did not pull the trigger," was conscious disregard.  (Italics omitted.)

The law, however, is more generous than defendant asserts.  " 'Even if the act results in a death that is accidental . . . the circumstances surrounding the act may evince implied malice.' " (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1425.)  "It is settled that brandishing a loaded firearm at a person is an act dangerous to human life." (*Ibid.*)  "Although a jury may determine, under the circumstances of a particular case, that a defendant's brandishing of a firearm did not pose a sufficient danger to human life to establish that the defendant acted with malice, in other circumstances the act of brandishing a firearm may be sufficiently dangerous to human life to support a finding of malice." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 96.)  Accordingly, the jury "was obligated to determine whether: (1) defendant's

17

drawing his loaded firearm, while facing the victim at point-blank range, was an intentional act; (2) the natural consequences of that act were dangerous to human life; and (3) the act was performed with knowledge of the danger to, and conscious disregard for, human life." (*Id.* at pp. 111–112.)

Likewise in *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1263, the court concluded the "jury could have easily concluded that pointing a loaded gun at someone and pulling the hammer back is an intentional act, the natural consequences of which are dangerous to human life, and that defendant deliberately did so with knowledge of such danger and with conscious disregard for [the victim's] life, even if, as defendant said, 'it was just all in play.' "

Defendant also maintains the prosecutor prejudicially disparaged defendant and defense counsel. He cites two asserted instances of misconduct: one in which the prosecutor stated in closing argument that defendant "arrogantly pointed out that the ballistics were inconclusive," and one in which the prosecutor stated in response to defense counsel's closing argument that, "One of my favorite things is when privileged grown men tell me my thought process."

"Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." (*People v. Sandoval* (1992) 4 Cal.4th 155, 180 (*Sandoval*). " 'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated. . . .' " (*People v. Boyette* (2002) 29 Cal.4th 381, 433.) "[T]he use of derogatory epithets to describe a defendant is not necessarily misconduct." (*People v. Friend* (2009) 47 Cal.4th 1, 32; *ibid.* [defendant described as " 'living like a mole or the rat that he is' "].) Here, simply calling

18

defendant "arrogant" was a colorful term within the bounds of acceptable argument.

As for the asserted disparaging comment about defense counsel, defendant cites no authority supporting his claim that calling someone "privileged" constitutes misconduct. Moreover, the prosecutor made the comment in response to defendant's closing argument, wherein defense counsel asserted the prosecutor decided not to subpoena J.W., but to have her arrested and brought to court, in order "to punish her and to break her will." While the prosecutor's comment that "One of my favorite things is when privileged grown men tell me my thought process," was perhaps unduly snide, it did not rise to the level of misconduct.

Defendant next claims the prosecutor misstated the evidence and argued facts not in evidence by suggesting the weight of a gallon of milk was what it would take to pull the trigger on defendant's gun.

A criminalist testified regarding the type of gun used to kill the victim. He explained that the type of gun used "comes out of the factory with a seven to ten[-]pound trigger pull [and] brushing the trigger is not seven to ten pounds. Seven to ten pounds is basically hanging up to two bags of sugar on that trigger before it will pull."

In closing argument, the prosecutor stated, "That makes express malice, intent to kill, pretty easy, particularly when as described by the expert the weight at which it takes to pull that trigger is up to two five-pound bags of sugar. I have two four-pound bags of sugar. They don't even sell five-pound bags of sugar." She further stated "after [defendant] moved closer [to the victim] and took out the gun, he pointed it at his head and then he pulled the trigger with enough force to be two five-pound let alone two four-pound bags of sugar."

19

Defense counsel did not object to the prosecutor's demonstrative use of two four-pound bags of sugar, but suggested it was a "set up." "Where are the two sacks of sugar? Ah, they're down there. Do you think for a minute that wasn't set up? As [the expert] testified about the sacks of sugar, and voila, we've got the sacks of sugar on the table."

In rebuttal, the prosecutor stated, "And yes, I bought the sugar at Safeway 10:00 o'clock on Sunday in case you're wondering. I put it in the bag because this is the action that it takes to pull that firearm. You know what else weighs the same as a bag of sugar? A gallon of milk."

While defendant does not dispute that using the sugar as a "visual aid . . . may not have been objectionable," he maintains the prosecutor's statement about the weight of a gallon of milk was misconduct because "[t]here was no evidence as to the weight of a gallon of milk."

" ' "[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 335.) A prosecutor, however, " ' " 'is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' " ' " (*Hill, supra,* 17 Cal.4th at p. 819.) Here, the prosecutor's reference to a gallon of milk being about the same weight as a bag of sugar certainly referred to a matter of common knowledge. In any case, the passing reference to the weight of a gallon of milk was harmless.

Lastly, defendant claims the prosecutor "violated [his] right to attorney client privilege during her closing argument." During rebuttal, the

prosecutor stated, in reference to the testimony of Jackie W., "He also didn't say he ever heard anything about an accident because the defendant hadn't come up with that lie yet because this wasn't an accident, and *neither lawyer even knew to ask it.*" (Italics added.) The prosecutor also stated, "Did you once hear the defendant even say, quote, '*I told my lawyer it was an accident?*' No. The only time the defendant said that is up on the stand. So the only thing his lawyer can argue is my client testified he told me from the beginning, but there's no evidence to corroborate that *because the defendant never said it* until we were well into this trial." (Italics added.)

Defendant asserts the italicized portions of the closing statement directed the jury to "infer guilt on the murder charge because [defendant] did not reveal the substance of what would have been a privileged conversation with his attorney." Relying on *People v. Velasquez-Palacios* (2015) 235 Cal.App.4th 439 (*Velasquez-Palacios*), he maintains this was "[p]rosecutorial interference with [the attorney/client] privilege."

In *Velasquez-Palacios,* the prosecutor provided defense counsel with an English translation of the police interrogation of defendant, which had been conducted in Spanish. (*Velasquez-Palacios, supra,* 235 Cal.App.4th at p. 442.) The prosecutor fabricated and added the following two additional lines to the translation: " '[DETECTIVE]: You're so guilty you child molester. [DEFENDANT]: I know. I'm just glad she's not pregnant like her mother.' " (*Id.* at pp. 442–443.) After receiving the translated transcript, defense counsel advised him to make an offer to settle the case. (*Id.* at p. 443.) After defense counsel asked the prosecutor for " 'the exact CD reviewed by [the People's] transcriber/interpreter,' " the prosecutor admitted to falsifying the transcript. (*Ibid.*)

21

Defense counsel then moved to dismiss the charges based on prosecutorial misconduct. In its response to the motion, the prosecution claimed the fabrication was a " 'jest,' " that defense counsel had told him defendant did not have a viable defense, and the defendant had not been prejudiced. (*Velasquez-Palacios, supra,* 235 Cal.App.4th at p. 443.) The public defender's office removed defense counsel from the case, citing "the appearance of impropriety created by [prosecutor's] allegation" that defense counsel stated defendant did not have a valid defense, as well as the "complexity that would arise from having [defense counsel] work on the case after testifying about privileged matters in the upcoming evidentiary hearing." (*Ibid.*)

The trial court dismissed the charges against defendant, finding the prosecution had failed to prove the fabrication was a joke, but "even if it had been done in jest, [the prosecutor's] dissemination of the fraudulent confession during plea negotiations was 'egregious, outrageous, and . . . shocked the conscience.' " (*Velasquez-Palacios, supra,* 235 Cal.App.4th at p. 444.) The trial court concluded the misconduct " 'diluted the protections coming with the right to counsel' and ran the risk of fraudulently inducing defendant to enter a plea and forfeit his right to a jury trial." (*Ibid.*)

The circumstances here are in no way comparable to those in *Velasquez-Palacios.* Nothing about the prosecutor's rebuttal " 'diluted the protections' " of defendant's right to counsel. Indeed, the prosecutor's comment regarding whether defendant ever said he told his lawyer the killing was an accident, was in response to defense counsel's closing argument in which he raised the issue of defendant's testimony about what he told his attorney. Defense counsel stated, "And it's been pointed out repeatedly incorrectly that my client just kind of cooked up this accidental

discharge defense over the weekend after the prosecution case had rested. That's a suggestion. But if you recall during the cross-examination of my client, that was suggested to him and *he said I told my attorney from day one*." (Italics added.) In rebuttal, the prosecutor correctly pointed out that defendant did not say that, noting "Did you once hear the defendant even say, quote, '*I told my lawyer it was an accident?*' No."[8] (Italics added.)

In sum, defendant has failed to show any instance of prosecutorial misconduct, and, in any case, any asserted misconduct was not prejudicial.[9]

### *Substantial Evidence of Premeditation and Deliberation*

Defendant asserts there was insufficient evidence he acted with premeditation and deliberation and therefore "the prosecutor could prove at most that he was guilty of second degree murder.

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the

---

[8] In that regard, defendant testified only that "I told my lawyer everything from day one. . . . I wasn't even going to come here and fight it. I wasn't. I was going to tell it all like I'm telling now."

[9] We therefore need not, and do not, reach defendant's claim that his counsel was ineffective in failing to object to the asserted instances of misconduct. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)

judgment the existence of every fact the trier could reasonably deduce from the evidence.' ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212–1213, italics omitted.) "The standard of review is the same . . . where the People rely primarily on circumstantial evidence." (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

Defendant, relying on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), maintains the record lacks the three specific categories of evidence *Anderson* requires.

In *Anderson* the court held: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Anderson, supra,* 70 Cal.2d at pp. 26–27, italics omitted.)

However, "[i]n our Supreme Court's most recent iteration on the topic, the court had occasion to point out that the three categories provide 'one

framework for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation.' [Citation.] [¶] The high court has further cautioned that the *Anderson* categories are only a set of 'guidelines' for analysis. (*People v. Sanchez* (1995) 12 Cal.4th 1, 32 [overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22] . . . ['We have recently explained that the *Anderson* factors do not establish normative rules, but instead provide guidelines for our analysis.'].) [¶] In particular, the court has emphasized that the three categories themselves do not constitute a substitute for, or a rewriting of, the actual elements of first-degree murder. (*People v. Thomas* (1992) 2 Cal.4th 489, 517 . . . ['Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first-degree murder or alter the substantive law of murder in any way.'].)" (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1112–1113, italics & fns. omitted.)

" ' " '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citation.] ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citation.] Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other

things." (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*).) " 'First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly. . . .' " (*People v. Nazeri*, *supra*, 187 Cal.App.4th at p. 1113.)

Defendant concedes there was evidence of an intent to kill, stating "firing a gun at someone's head shows that the person who fired the shot intended to kill his target." He maintains, however, there was "no evidence of planning activity," no evidence of a preconceived design to kill Thomas, and no evidence of motive.

However, evidence that a defendant arrives at the scene carrying a weapon suggests planning and a preconceived design. (*People v. Potts*, *supra*, 6 Cal.5th at p. 1027; *People v. Elliot* (2005) 37 Cal.4th 453, 471 ["That defendant armed himself prior to the attack 'supports the inference that he planned a violent encounter.' "].) Here, defendant arrived at the scene with a loaded weapon to confront Thomas about what he knew about Esau Davis's killing. The evidence of the killing, both testimonial and videotaped, shows that after defendant spoke with Thomas for a few moments, he pulled out a gun, pointed it at Thomas's head and shot him, and left quickly before Thomas fell to the ground. While this sequence of events happened with relative speed, the evidence does not show, as defendant claims, that the shooting was simply a " 'sudden random "explosion" of violence.' "

Defendant also urges there was no evidence of motive, the second *Anderson* category. To the contrary, there was evidence defendant told J.W. he shot Thomas because Thomas had disrespected him. There is no requirement that the motive be rational. " '[The] law does not require that a first degree murderer have a "rational" motive for killing. Anger at the way the victim talked to him . . . may be sufficient.' " (*People v. Miranda* (1987)

44 Cal.3d 57, 87, abrogated on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)

In sum, viewed as a whole, there was substantial evidence supporting a finding of premeditated and deliberate murder.

### *Fines and Fees*

Defendant maintains the imposition of various fees and fines without a determination of his ability to pay violated his due process rights under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). The trial court imposed a $10,000 restitution fee (§ 1202.4, subd. (b)), a suspended $10,000 parole revocation fee (§ 1202.45), a $40 per conviction court operations assessment fee and a $30 per conviction criminal conviction assessment fee.[10]

In *Dueñas*, the defendant was a chronically ill, unemployed homeless woman with cerebral palsy and a limited education who supported her two children through public aid. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1161.) She had lost her driver's license because of her inability to pay her juvenile citations and then had acquired three misdemeanor convictions for driving without a license because the accumulating fines and fees prevented her from clearing the citations and recovering her license. (*Id*. at p. 1161.) She experienced a series of "cascading consequences" due to "a series of criminal proceedings driven by, and contributing to, [her] poverty," and she had already been ordered to pay the charges by the end of her probation period. (*Id*. at pp. 1160, 1163–1164.) The Court of Appeal reversed the challenged assessments, holding "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a

---

[10] Defendant does not challenge the restitution of $7,500 the court ordered paid to the Victim's Compensation Board.

determination that the defendant is able to pay, are . . . fundamentally unfair [and] imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process. . . ." (*Dueñas*, at p. 1168.) It also ordered the trial court to stay the restitution fine "unless and until the People prove that [the defendant] has the present ability to pay it." (*Id*. at pp. 1172–1173.)

To begin with, defendant's *Dueñas* challenge has been forfeited by his failure to raise it in the trial court. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054.)

Furthermore, even if he had preserved the issue, any failure to hold such a hearing in the instant case was harmless. (See *Lowery*, *supra*, 43 Cal.App.5th at p. 1060 ["Nothing in this record suggests [defendants] might be unable to work, or that they might be ineligible for prison work assignments. As such, we can infer that they will have the opportunity to earn prison wages and they can start paying these financial obligations."]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 ["We can infer defendant in this case has the ability to pay the fines and fees imposed upon him from probable future wages, including prison wages."]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 140 [because defendant had "ample time to pay [fine] from a readily available source of income while incarcerated"].)

Accordingly, there is no merit to defendant's fallback ineffective assistance argument—that by failing to raise *Dueñas,* his counsel was prejudicially ineffective. " ' "In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume

28

that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " ' " (*People v. Henderson* (2020) 46 Cal.App.5th 533, 549.) In short, on direct appeal, a defendant must demonstrate counsel's failure to object lacked any "rational tactical purpose" and but for counsel's lack of objection, there is a reasonable probability the result would have been different. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007–1009.) Given the demonstrable lack of prejudice to defendant, his ineffective assistance claim necessarily fails.

## DISPOSITION

The judgment is affirmed.

                                       _____

                                       Banke, J.

We concur:

_____

Humes, P.J.

_____

Margulies, J.

A160961, People v. Vines

30